**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2047-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RONALD J. TESCHNER,

    Defendant-Appellant.

_____

Submitted September 24, 2025 – Decided December 1, 2025

Before Judges Currier, Smith and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 20-02-0263.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Stephen W. Kirsch, Designated Counsel, on the brief).

Raymond S. Santiago, Monmouth County Prosecutor, attorney for respondent (Monica do Outeiro, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from his convictions of the murder of Jacqueline Terrulli, arson, and other offenses after a jury trial, asserting error in certain evidentiary rulings, the jury instructions, the court's decision to remove him from the courtroom on several occasions for his misbehavior, and the recusal of one of his counsel. After a careful review of these contentions in light of the record and applicable principles of law, we affirm.

I.

Defendant was charged with murder, N.J.S.A. 2C:11-3(a)(1) and/or N.J.S.A. 2C:11-3(a)(2) (count one); felony murder, N.J.S.A. 2C:11-3(a)(3) (count two); robbery, N.J.S.A. 2C:15-1 (count three); burglary, N.J.S.A. 2C:18-2 (count four); aggravated arson, N.J.S.A. 2C:17-1(a) (count five); aggravated assault, N.J.S.A. 2C:12-1(b)(8) (count six); desecration of human remains, N.J.S.A. 2C:22-1(a)(1) (count seven); three counts of theft, N.J.S.A. 2C:20-3(a) (counts eight, nine, and ten); possession of fentanyl, N.J.S.A. 2C:35-10(a)(1) (count eleven); two counts of resisting arrest, N.J.S.A. 2C:29-2(a) (counts twelve and thirteen); two counts of unlawful possession of a weapon, N.J.S.A. 2C:39-5(j) (counts fourteen and fifteen); and certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (count sixteen).

## Background

Trial took place between September 20 and October 25, 2022. We present the following pertinent facts from the trial record. Terrulli became romantically involved with defendant in 2019 and permitted him to move into her rented home where she lived with other family members. Terrulli's sister, Briten Alston, told the jury that after defendant moved in, things in the house became "a little eerie" because everyone was afraid of defendant "drinking or doing drugs" and because he would "sit there and just stare." At one point, Alston told Terrulli she was worried defendant was "going to snap," but Terrulli told her she could "handle him" and not to worry about it. Alston said her sister "just wanted [defendant] to stay straight" and "got very frustrated" when defendant "couldn't seem to stop" using alcohol and drugs.

During this timeframe, Terrulli became friendly with Meryl Kolb and the two decided to open a business together. Kolb testified that she thought Terrulli was not "happy with" her relationship with defendant.

On September 11, 2019, defendant and Terrulli went to Kolb's house so defendant could do some handyman work there. Kolb described defendant as "angry" and "frustrated" with Terrulli, "because [Terrulli] was telling him what to do all the time . . . ." In a moment when Terrulli was not in the room,

defendant asked Kolb if she "knew somebody with a sewing machine, so he could sew [Terrulli's] mouth shut because she's a f[***]ing know-it-all." Kolb said defendant again called Terrulli a "know-it-all" in an "annoyed" tone later on.

That evening, Terrulli and defendant were alone at Terrulli's home, as the rest of Terrulli's family had gone to Atlantic City. Terrulli and Kolb spoke on the phone and exchanged text messages about their business, expressing excitement about the future and discussing their "grand opening." They made plans to meet up the following morning at 8:00 a.m. During the phone call, Terrulli told Kolb she "want[ed] to get [defendant] . . . out of the house[]" and "get rid of him." Kolb testified that Terrulli was speaking loudly when saying this, and knowing Terrulli was alone with defendant, Kolb asked Terrulli if she was okay and whether she wanted to stay at Kolb's home. Terrulli responded that she was "fine" and could "handle" defendant.

Terrulli also spoke to and texted with Alston that evening, telling her sister she wanted defendant to move out. Alston testified that Terrulli said she "couldn't do it anymore and she just wanted [defendant] out" when the family got home. In another text, Terrulli said defendant was "just way too much for anyone" and that she was "way too old for this and him" and "need[ed] some

4

normal sanity in [her] life." In a subsequent phone call, Terrulli told Alston she intended to sleep in a separate room with the family's dog.

The Fire

Sam Garfunkle lived across the street from Terrulli. At around 7:25 a.m. on September 12, 2019, Garfunkle was pulling out of his driveway to take his children to school when his son noticed smoke coming from Terrulli's house. Garfunkle got out of his car and ran to help, calling 9-1-1. He testified that the fire was spreading quickly from the right side of the house, and that in "what felt like seconds . . . it seemed like the whole house was on fire." While running around the left and rear of the house, Garfunkle saw windows in the back "cracking" and smoke coming from the second floor. Garfunkle did not see Terrulli's Jeep at the house or driving away from the area. He stated he noticed a gas can outside the garage and noticed a "heavy smell of gasoline."

Officer Karen Noel of the Ocean Township Police Department (OPD) responded to the 9-1-1 call, where she saw that the entire right side of the house was on fire and there were flames coming from the front door and windows. The firefighters' efforts to enter the home to search for anyone inside were hampered by the black smoke coming out of the house. At some point, part of the second floor and roof collapsed. Police and firefighters determined that it was too

dangerous for anyone to go inside until after the blaze was quelled and continued fighting the fire from the outside. Eight to ten fire companies responded to the site, and it took them "many hours" to suppress the fire.

Meanwhile, police learned that Terrulli's family were safe in Atlantic City, but Terrulli and defendant had not been located. Law enforcement began the search for Terrulli's Jeep. Terrulli also kept a trailer at her home, which she used in her landscaping business.

When Terrulli did not show up for their meeting on the morning of September 12, Kolb repeatedly called her, but got no response. Terrulli also did not answer texts and calls from Alston, who had been informed of the fire and was on her way home; Alston said her sister was "never" without her phone. Police tried to call Terrulli's phone, but the calls went unanswered and by 9:00 a.m. went straight to voicemail.

Thereafter, police made emergency requests for information to Terrulli's cell phone carrier. They learned that the phone's "last active ping" at the time of the request was to a cell tower at a park in Paterson around 9:00 a.m. on September 12. Additional phone records, E-ZPass records, surveillance videos, and data taken from the Jeep confirmed that the vehicle and phone left Ocean

6

Township and traveled to Paterson at around the same time Garfunkle noticed the fire.

Surveillance video from the afternoon of September 12 showed the Jeep parked near a store outside Paterson owned by defendant's ex-girlfriend, Natalie Rubestello. A friend of defendant's, Mark LaCorte, testified that defendant called him that morning after not speaking to him for months. When LaCorte met with defendant shortly thereafter, defendant offered him some landscaping equipment to repay a debt. LaCorte agreed to look at the items, and defendant came to his house driving "a white Jeep" with "[k]ind of a bunch of lawn equipment" in it. LaCorte told police the Jeep was "a complete mess" and full of "a clutter of s[***]." LaCorte said defendant "seemed normal," was not dirty, and did not smell like smoke. LaCorte told defendant he did not need any of the equipment, and defendant left.

<u>Defendant's Arrest</u>

Later, on September 12 and into September 13, 2019, law enforcement continued to search for Terrulli, defendant, and the Jeep. At around 1:00 a.m., the Jeep was found parked on the side of the road in a residential area. Defendant was sleeping inside, "partially leaning out of the driver's window."

A-2047-22

OPD Sergeant[1] Jesse Orbach testified that the Jeep was filled with "a lot of personal belongings" to the point where "it looked like nobody else . . . could fit in the vehicle . . . ."  Defendant was not wearing shoes, and Orbach observed multiple decks of a substance they initially thought was heroin but that was later tested and revealed to be fentanyl on his lap and near his feet.  Orbach asked defendant to exit the vehicle and as he began to handcuff and arrest him, defendant pulled away and ran for approximately twenty-five feet before officers were able to secure him.

Photographs were taken of defendant at OPD, depicting "some abrasions" or "scratches" on defendant's forearms and biceps.  When shown the photographs of defendant at trial, Alston testified that she had not seen any scratches on defendant's arms before she left for Atlantic City on September 10.  Kolb said defendant was wearing a black tank top while they were together on September 11, and his arms were uninjured.

A search of Terrulli's Jeep revealed landscaping equipment, a chainsaw, a toolbox, a printer, a hammer and rubber mallet, cleaning supplies, shoes and clothing including at least one item of women's clothing in a leopard print, a Coach brand bag full of toiletries, a Versace bag with sunglasses in it, jewelry

---

[1]  Orbach was a detective with OPD at the time of the fire and investigation.

A-2047-22

including a Rolex watch, and four cell phones. Police found cash, pens, credit cards,[2] and a BJ's Wholesale membership card in Terrulli's name in the well of the driver's side door.

Police also found two shotguns inside cases in the Jeep. The guns were in "near pristine" condition, and there was no ammunition anywhere in the vehicle. Cyrus Seervai, who owned a sporting goods store, testified he had sold the guns to Terrulli.

Alston confirmed that the jewelry, printer, equipment, and several other items found inside the Jeep belonged to Terrulli. She testified that her sister never kept her landscaping equipment in the Jeep because she had a trailer for that and did not want the equipment to get her vehicle dirty. She had never seen Terrulli's gun cases in the Jeep either. Alston further said she had never known Terrulli to give defendant permission to use her credit cards.

Defendant was initially charged with receiving stolen property, possession of a controlled dangerous substance, and unlawful possession of the guns found in the Jeep.

---

[2] One of the credit cards was in Alston's name.

A-2047-22

State Troopers and their K-9 partners searched the burnt and partially collapsed remains of Terrulli's rented home, as well as a nearby wooded area for several days following these events, but did not find the presence of any human remains. Investigators found the remains of Terrulli's dog and one of her cats inside an upstairs bathroom, those of another cat under a fallen door, and those of a cockatoo bird in its cage on the second floor.

Fire Investigator Douglas Rowell testified that, based on his investigation, the blaze started in Terrulli's bedroom on the first floor and spread to the nearby hallway and stairwell and then beyond. The greatest damage to the house was at its rear. Terrulli's bedroom, at the back on the first floor, was damaged enough that the second floor collapsed down into it. Rowell ruled out a lightning strike, electrical issues, and smoking materials as causes of the fire. He testified that while the actual cause was "undetermined," it was most likely that an "open flame" was used to ignite "combustible materials" through "human behavior."

Samples of material taken from Terrulli's bedroom and at the base of the stairs to the second floor did not reveal the presence of any ignitable liquids. However, both Rowell and Laurel Mason, who tested the samples, stated that it was possible the fire was caused by a liquid that would not have been identifiable

in post-fire chemical analyses. Rowell also acknowledged that it was "impossible" to determine with exactitude what the "first fuel" or material originally set on fire was, due to the collapse of the second floor into Terrulli's bedroom and attendant spread of debris in the area.

Testimony of Defendant's Cellmates

Following his arrest, defendant was incarcerated at the Monmouth County Correctional Institution (MCCI). From September 19 to September 25, 2019, he was cellmates with Michael Smith, who testified that he had general conversations with defendant, and that on September 22, 2019, the two talked about the crimes for which they had been arrested.

Smith said defendant told him he would regularly "steal" his "girlfriend's" car when she was sleeping, and drive to Paterson to buy drugs. Defendant also said he overheard his girlfriend on the phone telling people she wanted him to move out of her house, and around 4:30 a.m. the following morning on September 12, he began taking items from her including jewelry, watches, purses, and guns. According to Smith, the girlfriend caught defendant taking the items and trying to leave in her vehicle and threatened to call the police.

Defendant told Smith he "handled" or "dealt with" his girlfriend, then took her body and dumped it "[s]omewhere by a transportation center." Smith said

defendant told him he went back and started a fire at her house using nail polish remover at around 7:00 a.m., then drove to Paterson, sold some of her property, and used the money to buy drugs. Defendant's intention was to go to a rehab facility to establish an alibi. Smith also said defendant was concerned about scratches on his arms that police had photographed after arresting him. Defendant told Smith the scratches were from "[w]restling around with" the "person in question."

Edward Patterson was also defendant's cellmate at MCCI, from September 30, 2019 to March 20, 2020. After hearing "a little bit" about defendant's charges, Patterson came up with a "plan" to become friendly with him and find out information about his case. He testified that he hoped to share the information with law enforcement to obtain leniency in his own criminal prosecution.

According to Patterson, defendant told him he struck Terrulli on the side of the head with a rubber mallet while they were alone in her house, rendering her unconscious. He did this after Terrulli refused to loan defendant her Jeep so he could buy drugs. Patterson testified that defendant never told him "fully" how he killed Terrulli, but said that defendant and Terrulli "got into an argument . . . and the next thing [defendant] [knew]" was that "she was dead." According

12

to Patterson, defendant said he loaded Terrulli's Jeep with guns and other items, then started a fire in Terrulli's bedroom because that was where "a lot of different type[s] of evidence" was located. Defendant told Patterson he dumped Terrulli's body near a river in Paterson, where he had gone to buy drugs.

Both Smith and Patterson informed law enforcement of the conversations they had with defendant while incarcerated. However, Terrulli's body was not found at either of the referenced locations.

At trial, Smith testified he had multiple prior convictions, and informed law enforcement about his conversations with defendant because he hoped to be released from jail. He was told they "[couldn't] promise anything," but the rest of his ninety-day sentence was suspended, and he was released from incarceration the evening after he gave his statement.[3]

Smith also admitted that the day after defendant talked to him about Terrulli's death, he talked to his mother on the phone about defendant's case. Portions of this call were read to the jury. Smith told his mother that defendant was his "bunkie," and asked her to "Google [defendant's] name" to see if any of

---

[3] While released, Smith was almost immediately arrested in Ocean County on a burglary charge. He was still incarcerated when he testified at defendant's trial. Smith testified that neither the Ocean County Prosecutor's Office nor the Monmouth County Prosecutor's Office had given him any "benefit" for testifying.

the search results mentioned a "[m]issing woman" or a "[f]ire or homicide in Monmouth County." Smith also asked his mother to contact the Monmouth County Prosecutor's Office and tell them he wanted to talk to them about his "bunkie." Smith's mother did so, initiating Smith's contact with the prosecutors.

Patterson testified that he suffered from schizophrenia and was unmedicated when he spoke with defendant at MCCI. He also admitted that he had multiple prior convictions including a first-degree robbery charge from 2019 to which he had pled guilty as part of an agreement to give a statement and testify in defendant's case. The prosecutor informed the jury of Patterson's plea agreement in that case: Patterson would receive a three-year sentence and three years of parole; Patterson had initially faced a life sentence due to being eligible for an extended term.

Patterson also testified that in his quest to obtain leniency in his own case, he lied to the prosecutor's office and claimed he knew information about defendant that defendant had not yet divulged, such as where Terrulli's body was and where the fire started in Terrulli's house. He said even after defendant talked to him, Patterson wanted to provide only "little bits" of knowledge to get the prosecutors' attention and then work on getting more information. Patterson admitted that at one point, he wrote a letter to prosecutors saying that he and

14

defendant never spoke about the case. He explained that he did so because defendant had accused him of "telling on" him and he did not want to lose his source of potential information.

## Discovery of Terrulli's Remains

In May 2020, a demolition company began to tear down Terrulli's rented house. In June, the company's employee was excavating the foundation of the house with a large machine when he noticed "a smell, like a rotten smell" that he had not previously encountered on the property. Later that day, he saw "something white" in the orange dirt he was excavating. Upon investigation, he saw a human foot and a white garbage bag.

The white bag, along with another unearthed black garbage bag, contained Terrulli's remains; her identity was confirmed via forensic examination of the body's teeth and Terrulli's dental records. According to detectives, the body, which had suffered "extensive decomposition," had been "cut in half," and the left arm had "become detached" from her body. Terrulli had been buried approximately four-and-a-half feet underground, about three feet from a door leading outside from her bedroom.

Anna Delaney, a forensic anthropologist with the New Jersey State Police who examined the remains, testified they were consistent with a body that had

15

been decomposing underground for eight or nine months. She said that the "significant trauma" to Terrulli's ribcage was "most likely" caused by the excavation machine and she found no other trauma to the body that was not likely inflicted by the machine. Laura Cannon, who performed DNA testing on Terrulli's fingernails—which had sloughed off her body and were found inside the trash bags—testified that only Terrulli's DNA was found on them.

State troopers explained at trial that many factors can impact a trained dog's ability to smell a body, such as temperature, weather, and wind direction. One trooper said if a body was "covered up, or concealed, or sealed," the odor would not be able to "get out" for the dog to detect it, citing examples of bodies that are "buried underground" in a "shallow grave," underwater, "wrapped in a tarp" or put in a "container," or covered by a "building collapse," as circumstances that would make it harder for a dog to notice a smell.

The items found in Terrulli's Jeep included a pair of boots caked with dirt, which belonged to defendant. Dirt samples from the boots, and samples taken from outside Terrulli's residence, including the grave site, were tested and compared by a forensic geologist. The geologist opined at trial that he found an "inclusion" between the soil taken out of the grave site and the soil on the boots.

16

Dr. Stephen Melito, a forensic pathologist and assistant medical examiner with the Middlesex Regional Medical Examiner's Office, also examined Terrulli's remains and provided a report and expert testimony at trial. The remains were heavily decomposed and skeletal, which Melito said hampered him in discerning information. For example, he said it was impossible to tell if there had been trauma to Terrulli's internal organs, because of their decomposed or absent condition. He also said it would be difficult to determine if Terrulli was strangled, because her eyes and the mucosa around them and in her mouth had completely decomposed.

Melito testified that although he found no fractures or trauma to the skull or neck bones, this did not necessarily mean Terrulli was not injured, but only that any potential injuries did not involve trauma to her bones. He reiterated that the absence of skin and tissue precluded his ability to discover any stab wounds or bruising to Terrulli's torso. However, he agreed with Delaney that the severe visible trauma to Terrulli's torso appeared to have been caused by the excavator.

Toxicology reports revealed only that Terrulli had consumed caffeine at some point just prior to her death, so Melito ruled out a drug overdose. Melito said that the remaining portions of Terrulli's organs did not indicate illness or

A-2047-22

another natural cause for her death.  Melito stated in his report and testimony that her cause of death was "undetermined," because there were "certain things [he couldn't] rule out based on the condition[] of her remains."

Over defendant's objection, the court permitted Melito to testify as to the manner of Terrulli's death.  Melito stated he had concluded Terrulli's manner of death was "homicide."  He explained that a manner of death must be selected from among five options set by the Center for Disease Control:  natural, accident, suicide, homicide, and undetermined.  Unlike the "cause of death," for which the medical examiner states a specific "mechanism in which somebody dies," such as "pneumonia, a gunshot wound, a stab wound, [or] a drug overdose," the manner of death is "a checkbox option."

Melito outlined the options for manner of death, explaining that a "natural" death involves "no toxin . . . [and] no injury that contributed even one percent to that person's death," an "accident" involves an injury where "there was no intent of that person being hurt," and a "suicide" occurs "where a person inflicts an injury or ingests a toxin for the sole purpose of causing . . . one's own harm."  Melito said that "homicide" means that "somebody else contributed to . . . somebody's death," and that this option should be selected if the medical examiner determines that "from a pathology perspective," the person's "death

A-2047-22

was at least one percent at the hands of somebody else." Finally, the "undetermined" category is used when a medical examiner "can't pick between those main four . . . ."

Melito testified that his determination that Terrulli's manner of death was homicide was based on his autopsy, toxicology testing, and "the investigation that occurred prior" to his examination of the body, including the fact that Terrulli had been found buried in trash bags near her home. He also said there was no evidence of any other manner of death, such as illness. Melito reiterated that all those factors led to a conclusion that Terrulli's death was at the hands of another person.

<u>Recusal of Defendant's Attorney</u>

Assistant Public Defender Allison Friedman represented Patterson—defendant's cellmate—for three months in late 2015. During that time, Patterson signed a HIPAA form and Friedman issued a subpoena for Patterson's medical records from Jersey Shore University Medical Center's Meridian Behavioral Health program and Park Place Treatment Center. Friedman also represented Patterson at an arraignment in November 2015. Friedman could not recall how many meetings, if any, she had with Patterson following his arraignment. A subsequent public defender took over Patterson's case in December 2015 and

19

represented Patterson when he entered a guilty plea in February 2016, and at his sentencing hearing in April 2016.

Patterson was indicted in Monmouth County in 2019 for armed robbery, aggravated assault, and weapons offenses. On March 12, 2020, the State entered into an agreement with Patterson under which he agreed to provide testimony in defendant's case. Patterson pleaded guilty in November 2020, to an amended charge of second-degree robbery, which was to be treated as a third-degree crime for sentencing, contingent on his cooperation. On January 6, 2021, the State informed the defense of its intention to call Patterson as a witness against defendant.

In February 2021, the State moved to recuse Friedman, who had been working as one of defendant's attorneys, because of her prior representation of Patterson. Defendant wanted Friedman to continue as his attorney. The court requested supplemental briefs on the subject and reviewed relevant parts of Patterson's "prior files" submitted by the State. The court advised during a hearing that it would "consider" defendant's preference, but the request could not overcome a conflict of interest if one existed.

The court analyzed the pertinent case law and controlling RPC 1.9(a) in a thorough well-reasoned oral decision on June 10, 2021. The court found that

Patterson's signing of a HIPAA form in October 2015 "clearly indicate[d] . . . that there was a discussion" between him and Friedman "prior to the arraignment" in November 2015. It also noted that the arraignment forms were filled out by Friedman "personally," and she said she had talked to Patterson at the arraignment and "was going to talk to him again about further medical records." The court found that the evidence Friedman obtained was "clearly" later used by the subsequent public defender "to obtain a favorable plea deal" for Patterson that included "probation conditioned upon successful completion of [a] behavioral healthcare program" with Rutgers Behavioral Health. However, the court eventually sentenced him to three years of incarceration.

The court next found that Patterson's and defendant's interests in the current case were materially adverse, because the State had proffered that it anticipated Patterson would testify that defendant confessed to Terrulli's murder and told him where the body was located. The court commented that this put the two men "on opposing teams," stating that it would be "the duty of the defense attorney to cross-examine" Patterson. The court found that as defendant's counsel, Friedman, would be responsible for probing the "significant issue" of Patterson's credibility, personally or alongside co-counsel.

The court found that Friedman's "familiarity" with Patterson, based on prior interactions with him and her receipt of confidential medical records, including ones pertaining to his mental health, would be "part of the calculus" in any "attack" she might make regarding his credibility. It stated that the "substance" of the confidential records were "relevant to any cross-examination," and found that because "[o]nly a person who represented Edward Patterson would know about" them, they would "put[] Allison Friedman at an advantage against her former client when he testifie[d] . . . ." The court concluded that the "specific facts" of this matter required Friedman's disqualification from representing defendant. The court denied defendant's subsequent motion for reconsideration.

The jury acquitted defendant of count thirteen, and convicted him of all other charges, with count four being reduced to a lesser-included offense of third-degree burglary. The court denied defendant's subsequent motion for a new trial. Defendant was sentenced to an aggregate term of life without parole for murder plus a consecutive term of ten years with an eighty-five percent parole disqualifier under the No Early Release Act, N.J.S.A. 2C:43-7.2, for arson.

II.

On appeal, defendant raises the following arguments for our consideration:

> POINT I
> THE MEDICAL EXAMINER IMPROPERLY OPINED, OVER OBJECTION -- WITH INSUFFICIENT EVIDENCE TO SUPPORT THE CONCLUSION -- THAT, ALTHOUGH HE COULD NOT TELL THE CAUSE OF THE DECEDENT'S DEATH, THE MANNER OF DEATH WAS "HOMICIDE."
>
> POINT II
> REVERSAL IS MANDATED BECAUSE:  (A) THE DEFENDANT WAS INAPPROPRIATELY REMOVED FROM THE COURTROOM MORE THAN ONCE; (B) EACH REMOVAL, EXCEPT ONE, FAILED TO PLACE THE DEFENDANT IN A ROOM WHERE HE COULD FOLLOW THE ONGOING PROCEEDINGS BY WAY OF A READILY AVAILABLE AUDIO OR VIDEO CONNECTION; AND/OR (C) THE INSTRUCTIONS DELIVERED TO THE JURY REGARDING THE EJECTIONS WERE HOPELESSLY DEFICIENT BECAUSE THEY FAILED TO TELL THE JURY NOT TO CONSIDER THE DEFENDANT'S ABSENCE FROM THE COURTROOM AGAINST HIM.
>
> POINT III
> THE TRIAL JUDGE IMPROPERLY DENIED DEFENDANT HIS CONSTITUTIONAL RIGHT TO COUNSEL OF CHOICE WHEN HE GRANTED THE STATE'S MOTION TO RECUSE ONE OF DEFENDANT'S LAWYERS FOR REASONS THAT

23

DO NOT AMOUNT TO AN ACTUAL CONFLICT OF INTEREST.

POINT IV
THE STATE IMPROPERLY PUT INTO EVIDENCE TELEPHONE CALLS BETWEEN DEFENDANT AND NATALIE RUBESTELLO WHICH CONTAINED INADMISSIBLE STATEMENTS BY RUBESTELLO WHICH REPEATED THE HEARSAY OPINIONS OF OTHERS THAT DEFENDANT WAS GUILTY OF THE CHARGED CRIMES.

A.

We begin our discussion with Point III, whether the trial court erred in recusing Friedman. Our evaluation of an order granting or denying an attorney disqualification motion is "de novo plenary review in light of the fact that a decision on such a motion is made as a matter of law." Twenty-First Century Rail Corp. v. N.J. Transit Corp., 210 N.J. 264, 274 (2012).

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e." U.S. Const. amend. XI. Where this right has been wrongfully denied, a defendant need not demonstrate prejudice; "the right at stake" is "the right to counsel of choice," and a violation of that right is "complete" when "the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the

24

representation he received." U.S. v. Gonzalez-Lopez, 548 U.S. 140, 146-48 (2006). An erroneous deprivation of the right to choose counsel is a "structural error" requiring reversal even if it appears that the counsel the defendant received was competent and the trial was otherwise fair. Id. at 146-50.

However, "the right to counsel of one's choice is not absolute." State v. Kates, 426 N.J. Super. 32, 45 (App. Div. 2012). The right to choose counsel is "circumscribed by the court's power to guard against conflicts of interest," to protect the court's independent interest in ensuring that trials are conducted within ethical standards, and that legal proceedings appear fair to observers. Ibid. In criminal proceedings, "it is incumbent on the courts to ensure that defendants receive conflict-free representation," and so the right to choose counsel "must yield when an actual conflict is found." State ex rel. S.G., 175 N.J. 132, 140 (2003).

In New Jersey, the Rules of Professional Conduct provide that "[a] lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing." RPC 1.9(a).

For purposes of deciding motions for recusal under this rule, matters are "substantially related" if:

> (1) [T]he lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client, or (2) facts relevant to the prior representation are both relevant and material to the subsequent representation.
>
> [City of Atlantic City v. Trupos, 201 N.J. 447, 452 (2010).]

The Trupos Court adopted this test to "protect[] otherwise privileged communications" between the former client and the attorney, "while also requiring a fact-sensitive analysis to ensure that the congruity of facts, and not merely similar legal theories, governs whether an attorney ethically may act adverse to a former client." Id. at 467.

"Prior representation, in and of itself, is not sufficient to justify disqualification." State v. Hudson, 443 N.J. Super. 276, 291 (App. Div. 2015). Further, a mere "appearance of impropriety may not be used as a basis to find a conflict of interest" under RPC 1.9(a). Id. at 280 (citing In re Sup. Ct. Advisory Comm'n on Pro. Ethics Op. No. 697, 188 N.J. 549, 563 n.5 (2006)). Instead, there must be some "factual underpinnings describing the prior representation" demonstrating that the attorney actually received confidential information from

the former client that may be used adversely to that client in the current matter, or that there truly are facts relevant to the prior matter that are also material to the current matter. Id. at 291-92.

Our courts have also been concerned with the protection of confidential information provided by former clients to attorneys now engaged in representation adverse to them. See State v. Sanders, 260 N.J. Super. 491, 497 (App. Div. 1992) (viewing it as "significant" that attorney's prior representation of the defendant involved inquiries into many personal matters, because the attorney's duty "not to disclose a client's confidences or secrets" would continue during his representation in the current matter of a co-defendant whose interests were adverse to the defendant's); State v. Needham, 298 N.J. Super. 100, 105-06 (Law Div. 1996) (expressing concern that the defendant's attorney might not cross-examine a former client vigorously, or that alternatively he might use confidential information gleaned from the prior relationship during that cross-examination); State v. Catanoso, 222 N.J. Super. 641, 645 (Law Div. 1987) (defense counsel's prior representation of a witness may have permitted him to acquire confidential information that could be used favorably by the defendant).

Although these cases utilized the since-rejected "appearance of impropriety" standard to evaluate the representation in question, they

27

nevertheless demonstrate that an attorney's use of confidential information when cross-examining or otherwise working against a former client is a primary concern. The change in the standard simply means there must be some proof that the attorney actually did obtain such information; this sharing of confidences may not merely be assumed from the fact of the prior representation on its own. See Hudson, 443 N.J. Super. at 290-91.

Applying these principles, we discern no error in the trial court's finding there was a conflict of interest placing Friedman's representation of defendant at odds with RPC 1.9(a). There was evidence of Patterson's signing a HIPAA waiver form and Friedman's subsequent subpoena of his mental health records that showed the two must have conversed about that issue. This topic is highly personal, and the records Friedman received would not have been available to her without Patterson's express consent. Therefore, this is not a situation where the trial court merely speculated that an attorney received confidential information from a former client. Instead, the court found there was direct evidence that Friedman did so, and the court reviewed that evidence, including the medical records themselves, when reaching its decision.

Here, Patterson's testimony was crucial to the State's case. Patterson had told the prosecutor's office that defendant confessed to hitting Terrulli with a

A-2047-22

mallet, killing her, setting a fire in her bedroom to destroy evidence, stealing items from her home to sell for drug money, and hiding her body. Patterson's testimony provided detailed descriptions of defendant's actions and bolstered the State's circumstantial evidence, including the fact that defendant was found in Terrulli's Jeep which contained a mallet, other items belonging to Terrulli, and drugs; Rowell's testimony that the fire very likely started in Terrulli's bedroom; and the fact that Terrulli's body was found buried and hidden. There is no indication the State sought Friedman's disqualification "merely as a strategic maneuver" meant to hamper the defense by requiring substitution of counsel. See Hudson, 443 N.J. Super. at 290.

Patterson's credibility was highly contested. The fact that he suffered from unmedicated schizophrenia and other mental health issues was raised by both the State and the defense at trial. The confidential records Friedman received during her prior representation of Patterson related to those very same issues. There was thus a true "substantial risk" that Friedman either could have used confidential information gleaned during the past matter against Patterson on cross-examination, giving her an unfair advantage against the State and against Patterson's testimony, or may alternatively have been unwilling or

unable to vigorously cross-examine Patterson on his mental health due to their prior attorney-client relationship, undermining defendant's case. Id. at 291-92.

We are satisfied the court did not err in granting the State's motion to recuse Friedman, as defendant's case was "substantially related" to Patterson's prior matter under the Trupos test. Her continued representation of defendant would have contravened RPC 1.9(a).

B.

In Point I, defendant contends the trial court erred by permitting medical examiner Melito to testify that Terrulli's manner of death was homicide despite the fact that her cause of death was undetermined. He asserts that Melito's opinion had "no conceivable scientific basis" and the testimony was based solely on the fact that Terrulli was "unconventionally buried," which was not a subject "beyond the ken of the average juror." Defendant asserts that Melito's opinions were not a proper subject of expert testimony under N.J.R.E. 702 and should not have been admitted.

During several pretrial hearings, defendant objected to Melito's proffered expert testimony that Terrulli's manner of death was homicide. On August 31, 2022, the court ruled on the objection and found, under relevant case law, that a medical examiner may reach a conclusion as to the manner of death through the

30

process of elimination, citing to State v. Lodzinski, 249 N.J. 116, 138-39 (2021). The court stated: "Here, the Medical Examiner concluded that given the circumstances surrounding the decedent's disappearance, subsequent discovery of her body several months afterward, and advanced state of decomposition, potentially obscuring autopsy findings, the manner of the victim's" death was a "homicide." The court found, under N.J.R.E. 403, there was no risk of undue prejudice to defendant or confusion for the jury if Melito testified to that effect. It further stated it would give the jury a limiting instruction concerning the evaluation of expert testimony when Melito testified and in its final charge. The court did give those instructions.

A court's evidentiary rulings are reviewed for abuse of discretion. State v. Burney, 255 N.J. 1, 20 (2023).

Under Rule 702, a qualified expert witness may testify on a subject "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." The proponent of expert testimony bears the burden of proof on admissibility. State v. Torres, 183 N.J. 554, 567 (2005). Rule 702 imposes three requirements:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable;

and (3) the witness must have sufficient expertise to offer the intended testimony.

[State v. Kelly, 97 N.J. 178, 208 (1984).]

These requirements are construed liberally in favor of the admissibility of expert testimony. State v. Jenewicz, 193 N.J. 440, 454 (2008).

As stated, defendant contends Melito's opinion on Terrulli's manner of death had no scientific basis. We disagree.

Melito's testimony was based upon his education, training, and examination of Terrulli's body, which was found heavily decomposed in a shallow grave dug in her yard and inside trash bags, and which upon Melito's examination showed no signs of a death by natural causes or other causative factors. Given the skeletal state of Terrulli's remains, Melito candidly testified that he could not opine as to the cause of her death. However, he also stated that, in his opinion, classifying the manner of death as homicide was based on his autopsy and consideration of the medical evidence and toxicology reports provided to him. See State v. Howard-French, 468 N.J. Super. 448, 465-66 (App. Div. 2021).

Melito testified in detail about his findings concerning the state of Terrulli's bones, organs, and tissue, and how his efforts were hampered by the decomposition. He also explained that medical examiners must choose from

one of five possible manners of death. He described how and why his findings led him to rule out natural causes, accident, and suicide, ultimately concluding that Terrulli's death was at least one percent at the hands of another person.

Defense counsel cross-examined Melito as to the strength and value of his opinion, based upon the quality of the evidence supporting it, and the jury was instructed that it should give weight to his testimony only if it felt that support was sufficient and found he was a credible witness. Melito opined using a process of elimination and carefully avoided mentioning any specific degree of homicide.

We are also unconvinced that Melito's testimony was improper because it was not outside the ken of the average juror. "[T]he proponent of expert testimony must demonstrate that testimony would 'enhance the knowledge and understanding of lay jurors with respect to other testimony of a special nature normally outside of the usual lay sphere.'" Kelly, 97 N.J. at 209 (quoting State v. Griffin, 120 N.J. Super. 13, 20 (App. Div. 1972)). "Expert testimony is not necessary to tell the jury the 'obvious.'" State v. Cain, 224 N.J. 410, 420 (2016).

The average juror would not know how to perform an autopsy or read toxicology reports, as Melito did. The jury would also not know how to rule out other potential manners of death, given that Terrulli's remains were so

33

decomposed that it was not possible even for a trained medical examiner to determine a cause of death. Because Melito's opinion on these issues was based in part upon medical and scientific data that the average layperson would not be able to understand, and because in general such testimony is routinely provided, the trial court did not abuse its discretion in permitting the testimony, particularly since it was accompanied by a limiting instruction.

C.

We turn to defendant's contentions regarding the admissibility of portions of the calls he made from jail to a former girlfriend, Natalie Rubestello, in which she "repeated the inadmissible lay opinions of others that [he] was guilty." He contends that no lay witness should be permitted to "offer[] an opinion about the guilt of [a] defendant."

While incarcerated pending trial, before Terrulli's remains were found, defendant made numerous phone calls to Rubestello, which were recorded and which the State later sought to admit into evidence. Defendant argued that the calls were hearsay, and that they should be "reduced as cumulative" if they were permitted to be played at all. The State agreed not to play "a number of calls" and advised that redactions had been made to remove references to defendant's prior convictions and drug use as well as other areas of concern. Ultimately, the

trial court ruled that the calls, with agreed-upon redactions, were admissible statements by a party opponent and that their probative value was not outweighed by any undue prejudice. Several calls were played during trial.

On appeal, defendant asserts the trial court should not have allowed three portions of the calls to be played. In the first of these conversations, Rubestello told defendant that she had become "like a celebrity out here." When defendant asked why, she said, "[e]veryone's saying it could have been you, it could have been you, it could have been you." Defendant asked her if she was "serious," and she replied that she was. Defendant then asked Rubestello if she thought he "would do that to [her]," and she said, "no."

In the second conversation, defendant asked Rubestello if she had "heard anything," because he "[didn't] really hear anything in [jail], other than from [his] lawyer . . . ." Rubestello said, "everybody thinks you did it out here. I think me, Mike, and Julie are the only ones that don't think it." Defendant asked, "But why? Why? I don't understand why?" Rubestello said she didn't know but told defendant that "[s]ome people" were wondering where Terrulli was and what he "was doing with her."

Finally, in the third conversation, defendant told Rubestello he had seen Terrulli's family in court. Rubestello said, "[t]hey basically think that you had

35

something to do with this.  Yup."  Defendant replied that was "[c]razy," saying he did not know "why they would think that."  Rubestello repeated, "[t]hey think you have something to do with it."  Defendant insisted to Rubestello that he "didn't have nothing to f[***]ing do with it," to which Rubestello answered, "I'm not saying you did.  I'm not saying you didn't.  I'm not saying anything.  It's just a very upsetting situation."  However, she then said she told "the prosecutors" he had never done anything violent to her.  Defendant responded he "never would" because he was "not that type of person."

We review the court's ruling admitting the calls for an abuse of discretion and see none.  Burney, 255 N.J. at 20.

Hearsay is generally not admissible except as provided in the Rules of Evidence.  N.J.R.E. 802.  Under N.J.R.E. 801(c), "hearsay" means a statement that the declarant makes outside of testifying at the current trial or hearing, that "a party offers in evidence to prove the truth of the matter asserted in the statement."

Rubestello's statements to the effect that other people around her, and Terrulli's family, believed defendant was responsible for Terrulli's death, were not hearsay.  They were not offered for the proposition that the other individuals believed that defendant harmed Terrulli.  They also were not offered for the truth

36

of Rubestello's belief that anyone held these opinions at all.  Instead, these statements were permitted to give context to other things defendant said:  his protestations that he had nothing to do with Terrulli's disappearance and did not know where she could be, and his general complaints about Terrulli and his relationship with her.  Indeed, in addition to saying that others thought him guilty of some crime, Rubestello also repeatedly reassured defendant that she did not believe he had done anything wrong.  These opinions also were not offered for their truth.

Further, the cases defendant cites in support of his argument that the calls contained "inadmissible lay opinions" are distinguishable.  They involved trial witnesses testifying as to their opinions on matters including the defendant's guilt.  For example, in State v. McLean, 205 N.J. 438, 459-63 (2011), the Court found that the trial judge erred by allowing a detective to testify that the defendant engaged in a "drug transaction," which was "an expression of a belief in defendant's guilt" and was not based on his own perceptions of the alleged transaction as required for a lay opinion to be admitted under Rule 701.  In State v. Frisby, 174 N.J. 583, 593-95 (2002), the Court similarly found that the trial judge should not have allowed the police witnesses to state their opinions that

the father's alibi had been "substantiated" or that the father was "more credible" than the defendant, "when that was the ultimate question for the jury."

By contrast, here neither Rubestello nor any police witness testified that defendant was guilty. No witness who might have had a great amount of influence on the jury, like a police detective, gave any testimony suggesting that Rubestello or the people she mentioned seemed credible in their views or that any of these individuals' opinions had any bearing on the investigation or the State's case. We are satisfied Rubestello's statements did not contain any "lay opinions" that the trial court should have evaluated and rejected under Rule 701. The court did not abuse its discretion in admitting the redacted jail calls.

D.

We next address defendant's contention that the court wrongfully removed him from the courtroom during certain portions of the trial. Defendant asserts for the first time on appeal, that even if the removals were not improper, the court erred by failing to place him in a room equipped with a live video or audio feed from the courtroom so he could follow the proceedings in real time. He also argues, for the first time, that the court's instruction to the jury concerning his absence from the courtroom was deficient because the judge did not explicitly state that the jurors must not "consider [his] absence against him."

38

Beginning with the very first recorded hearing in this record, defendant repeatedly interrupted courtroom proceedings to argue with the prosecutors, his attorneys, and the trial judge. The court instructed defendant on countless occasions to be quiet during argument and to confer with his counsel instead of interrupting. Defendant also accused the prosecutor of lying on multiple occasions, despite warnings from the court not to "disparage anybody in this courtroom." The court demonstrated patience and restraint on numerous occasions, telling defendant that it needed to "maintain the decorum of the courtroom" to make sure he would "get a fair trial by a fair and impartial jury," and cautioned that there were "certain sanctions [it could] take moving forward" if his disruptive behavior continued.

To support our analysis, we provide several examples of defendant's behavior during trial. On September 28, 2022, defendant addressed the court with a motion to replace his counsel, arguing that his attorneys were not sufficiently familiar with his case and were not asking witnesses certain questions. When the prosecutor began to argue in response to the motion, defendant repeatedly interrupted him. The court told defendant he needed to be quiet when others were talking, but defendant continued his interruptions, talking over the prosecutor and ignoring the court's further warnings.

39

Eventually, the court denied defendant's motion, finding that because the trial had progressed through over twenty witnesses and there was nothing to suggest that defendant's attorneys were not vigorously representing him, any further delay to replace counsel would be unnecessary. After stating his decision, the court told defendant "if you continue to be disruptive, this trial will proceed without you."

Later the same day, and on multiple occasions thereafter, the court cautioned defendant that some discussions between him and his counsel while the jury was present were "louder than they should be." At one point, the court noted defendant was speaking so loudly during testimony that a witness could not hear the prosecutor's questions.

During a hearing regarding the admissibility of the jail calls, defendant accused the court of "do[ing] nothing" to prevent the jury from finding out he had "been in prison before." After further colloquy, the court ended the hearing.

Before trial began on October 11, 2022, defendant interrupted his counsel to try to argue about an issue in his attorneys' stead. The court told him that it could "just put [him] downstairs and . . . finish the legal arguments," because he "ha[d] two attorneys." Defendant protested that he wanted to speak because he "kn[e]w more about [his] case than both of them together," to which the court

replied that it was "trying to teach [defendant] the proper decorum for [the] courtroom" but that "apparently [he hadn't] caught onto that." When defendant continued to argue, the judge said, "[g]et him out of here." Defendant asked if he was being removed "[b]ecause [he was] saying the truth," and the judge replied it was "because [he was] being disrespectful." After defendant was escorted from the courtroom, the court told defendant's attorneys that he had "been patient throughout the course of this trial with [their] client," and that they had "an obligation to do [their] best to make sure that he understands the decorum" expected in the courtroom.

Defense counsel noted that defendant had been "very audible" when talking about the jail calls during trial, "despite counsel's insistence not to talk about them because they do not help his case." Counsel also stated that defendant had "unfortunately consistently disclosed defense strategies, defense conversations . . . in the courtroom audibly." However, counsel objected to defendant's removal from the courtroom, saying "he has the right to be here." Counsel conceded that defendant "does not have the right to cause a mistrial or to be disruptive," but asked that the court "give him another chance . . . ." The court stated that it intended to do so but warned that if defendant "continue[d]

to be disruptive and loud and boisterous," it would remove him and instruct the jury on his absence and statements.

The court brought defendant back to the courtroom and cautioned him again that he needed to keep his voice down during witness testimony. The court said it hoped defendant could be "professional, respectful, and less combative" once the jury was brought in for the day's proceedings. Defendant remarked, "I know you're eager to throw me out." The court disagreed, stating it was "looking for every reason to see that [defendant did] the things that [he] need[ed] to do to remain in the courtroom," but that defendant had shown "disrespect," "rudeness," and "combativeness." The court warned that there was "a limit to [its] patience" but if defendant wanted to discuss "a different issue" rather than continue arguing about the jail calls, the court would allow it.

Defendant proceeded to complain once more that he had to "teach" his case to his attorneys at the counsel table. When the court asked him to stop, defendant interrupted. The court stated that it would not allow defendant to "impugn the integrity and reputation of [his] counsel," saying both attorneys were experienced and had provided "quality" representation.

During a recess, the court asked whether the defense had anything to bring to its attention, and defendant raised his hand. When the court permitted

42

defendant to speak, he said, "Monmouth County should be ashamed of themselves that they're attempting to solve murders with guys like this." The court advised the discussion would continue off the record.

Later that day, the court said:

> I did want to put on the record, Mr. Teschner, certainly I was observing all morning. You spent the vast majority of your time looking towards the back of the courtroom. There is no business for you in the back. I'm instructing you you're not to be talking to anyone in the gallery, you're not to be addressing comments, you're not to be scowling. Your attention should be to the front of this courtroom and the front of this courtroom only.
>
> I'm not going to tell you that again. And just as I've cautioned you throughout the course of this trial to keep your voice down, if it becomes necessary for me to remind you to turn forward, I will be more than happy to do that. Your business is here in front of the courtroom, and no place else.

Several times that afternoon, the judge admonished defendant for speaking loudly during witness testimony. During a recess, the court once more warned defendant to keep his voice down, and cautioned that if defendant did not, he would instruct the jury that it "must totally disregard" any statement they may have heard defendant make. The court said, "I have talked to you on a number of occasions about interrupting this proceeding, the orderly decorum and what is expected during the course of the trial." The court stated that

defendant's attorneys had "gone out of their way when they deem appropriate to interject some of [his] questions and to interject certainly lines of questioning that perhaps do not flow as smoothly as [they] ordinarily would flow during the course of a cross-examination without the constant interruptions." The court said, "this is the final time that I am going to warn you. I have said now on a number of occasions, with regards to my patience, bountiful but not infinite. We're at that point, sir." The jury returned to the courtroom and testimony continued from Patterson.

Defendant immediately spoke to the cross-examining attorney loudly enough to be transcribed: "Ask him to explain it." Counsel began to question Patterson about the letter he wrote to the prosecutor's office saying he had never spoken to defendant, but then said, "I'll withdraw that question." Defendant interjected, "[n]o, you don't." Then, in a sidebar, defendant continued to loudly call for his attorney to ask Patterson a question, despite the court again telling him to keep his voice down. Thus, approximately five minutes after the jury had returned to the courtroom, it was removed again for another sidebar discussion regarding defendant's misconduct.

Once the jury was gone, defendant continued complaining that his attorney "refuse[d] to ask every single question [he] asked him [to]." He insisted

44

that he could "prove [Patterson was] lying in five questions," but that his attorney kept telling him "every question [he] ask[ed] him to ask [was] not appropriate." Defendant continued talking while the judge attempted to stop him. The judge then said, "[w]e're done. He's gone," and directed for defendant to be removed from the courtroom.

The court advised it intended to bring the jury back in and give two limiting instructions: one concerning defendant's statements, and one concerning defendant's absence from the courtroom, saying:

> It's my intention at this point, from time to time I will bring [defendant] up, we'll see whether or not we have any improvement in the professionalism and the decorum, and if we do, then at that point it would be my intent to have him rejoin us. If I do not believe that . . . is going to happen, then clearly he will sit out the balance of our work together.

When the jury returned, the judge instructed it as follows:

> [B]efore we continue with the trial, I'd like to address what you've probably already noticed; the defendant's absence from the courtroom. Defendant has the absolute right to absent himself from these proceedings. At this time he has exercised that right. You're not permitted to speculate as to the reason for the defendant's absence. Defendant is presumed to be innocent. The burden of proving each element of a charge beyond a reasonable doubt rests upon the State, and that burden never shifts to the defendant.

45

You may have heard some statements or remarks made by the defendant in open court. He did not make those statements as a witness. His statements are not evidence. You must totally disregard any statements which you may have heard or anything that you may have seen. The only evidence that you are permitted to consider is sworn testimony of witnesses, together with any exhibits which may have been admitted into evidence. The defendant is entitled to have the jury consider all of the evidence admitted at trial and nothing else.

Patterson's cross-examination then resumed, followed by an additional witness's testimony.

At the close of court for the day, the court brought defendant into the courtroom to state that the testimony defendant missed had been "straightforward," and that he had instructed the jury as promised. The court then tried to explain to defendant that the questions he wanted his attorneys to ask, particularly those about "lie detector tests," were "not in conformance with either the rule of law or Rules of Evidence and were improper questions" that were rightfully objected to and subject to being stricken.

The court continued:

Having said that, [defendant], it's certainly your decision and your decision alone, whether or not you believe that you can comport yourself with the decorum that is appropriate for a trial . . . . It was your decision to be disruptive, in spite of the warnings and cautions that I've given you over our time together.

So you're go[ing to] have to give it some thought this evening. You certainly can make whatever determination that you want to make for tomorrow's proceeding. But if you cannot comport yourself with the way that you're supposed to behave in a courtroom, this proceeding will finish without your further presence.

Defendant responded that he thought the court was "exaggerating the amount of noise [he was] making" and "seem[ed] determined to throw [him] out of this courtroom." The court stated that its "intent was to try and do the very best to give [defendant] the guidance that [he] needed so that [he] could be here throughout the course of these proceedings," but that defendant was "determined to have the last word" and "[had] been disruptive throughout" the trial. Defendant began to argue again that his attorneys should have asked Patterson if he "was ever asked to take a lie detector test" because Patterson had "lied repeatedly." The court attempted to curtail this behavior, but defendant said, "[t]here are a lot of things I want to tell you but all you're gonna do is tell me to shut up and you're throwing me out." Defendant continued protesting that witnesses had lied and his attorneys wrongly refused to ask questions he wrote down for them.

The next day, the court began the proceedings by telling defendant it had "cautioned [him] at this point for months" about his "disruptive, combative,

47

disrespectful, and rude behavior" and "constant interruptions," and warning him that it was "[his] decision" whether he would conduct himself properly in the courtroom, or be removed again.  Defendant responded by again complaining that when he wrote questions down for his attorneys to ask, the attorneys "ignored" him and did not ask them; he said that was why he "started to talk a little loud."  As the court attempted to answer him, defendant went on, saying that the court "should let [him] speak because [he was] saying the truth" while "everybody that [got] on that stand" had lied.

Defendant suggested that if the court did not want him to interrupt during witness testimony, it should allow him to write down any questions and objections he thought his attorney should have asked and made but didn't and then let him read them out loud on the record at the end of the day.  He said that was his "solution to exposing all the lies that go on around here."  The court reminded defendant that many of the things he wanted his attorneys to do were not legally sound or permissible.  Defendant said the court was not giving him a fair trial and was "railroad[ing him] into a life sentence."  He also said his attorneys were "f[***]king clueless."

The court told defendant it would give him another chance, and that if he was disruptive and talked loudly during the proceedings, he would be removed

48

again. The court said it was up to defendant to decide if he wanted to be in the courtroom or not, and that if he did not, he would be given "an update at the end of the day [about] what transpired." He also reminded defendant to keep his attention on the proceedings and not to stare at the back of the courtroom.

At one point during witness testimony that day, defendant again spoke loudly enough to his counsel that it was picked up for transcription. He told counsel, "ask him," in regard to cross-examination of a witness, and shortly thereafter said he had "asked [him] [forty] times" to ask a question, though the topic of the question was not transcribed. The court told him to "keep [his] voice down."

During a break that day, the court stated it had "asked at least half a dozen times for [defendant] to keep [his] voice down," and that it was "up to [defendant] where [he] want[ed] to finish up the rest of the afternoon." When defendant again said that the reason he spoke up was that his attorneys were not reading the questions he wrote down for them, the court told him it was the attorneys' job to choose trial strategy and that the discussion was "done." The court stated that if defendant continued to disrupt the proceedings, he would be removed again and the jury would be given the same instructions as the previous day regarding his absence and statements.

49

The following day, defendant interrupted the direct examination of a witness to correct an answer to a question. The court stopped the proceedings, removed the jury, and warned defendant that if he spoke out again, he would be removed. When the jury returned, the court gave it the same instruction about disregarding defendant's statements as set forth above. At one point, the court said, "[s]ir, please face forward," most likely to defendant. When Alston's direct examination concluded, and while the jury was in the process of exiting the courtroom at the end of the day, defendant said, "[s]he does not have to come back." Because the jury was still present, the court tried to stop defendant from speaking, but defendant continued, saying, "[s]he is hurting, and obviously believes them. Let her leave and not come back. She doesn't need to come back. I have no questions for her."

Once the jury was gone, the court addressed defendant, saying it had been "extraordinarily patient" with him but that his outbursts were trying that patience. The court said it would instruct the jurors again the next morning that defendant's statements were not evidence. It continued:

> But, sir, we're at that crossroads. We're at that point, if this happens again—if it happens again, you will be out. This is not . . . time out. This is not where we have a little cooling off and we go through this again and again. You're not going to continue to disrupt the orderly procession of this trial.

Defendant said again that Alston was "obviously hurting" and that there was "no reason" for her to come back for cross-examination. He then continued interrupting as the court attempted to tell him that he "shouldn't be speaking during the course of this trial" and he would have an opportunity to testify himself if he wished but until then he should stop speaking so loudly. Eventually, the court advised defendant's attorneys that they could talk with defendant about strategy and whether Alston should be cross-examined, and reiterated he would instruct the jury to disregard defendant's statements and "move forward."

At the start of the next day, before the jury came into the courtroom, the court counseled defendant that if he could not "comport [him]self with the decorum and the professionalism that is expected in any court," he would "spend the rest of the time downstairs, and [his] attorneys [would] bring [him] the information as it unfold[ed] during the course of the day." The court said it would "start the day afresh and anew," but that it was defendant's choice whether to abide by the rules or to be removed for failing to do so. When the jury was brought in, the court again gave the instruction concerning defendant's statements.

At some point during the proceedings that day, defendant "ripped up a court document" he had previously signed, while the jury was present. Later, after the jury was dismissed for the day, he interrupted a colloquy about the jail calls that had just been played. At that point, the court said "[g]et him out." While he was being escorted out, defendant said that "[a]nywhere else there'd be a mistrial" and that he would have "no problem being quiet, if you play fair."

At the end of the court's colloquy with counsel, the court told defendant's attorneys that they "need[ed] to impress upon [defendant] that he has had his last chance today" and that he could not "continue to be disruptive . . . make remarks . . . or look in the back of the courtroom." The court said that starting with the next day of trial, "the next time [defendant] disrupts this proceeding may be the last time . . . ."

At the start of proceedings on the next trial date, defendant interrupted his counsel's argument. The court asked him to stop, then denied his motion for a mistrial. When defendant protested, the court said it was "going to give [him] another warning" about his conduct. The court said this would be defendant's first warning of the day, and that if he could not comport himself properly after this, he would be "gone" for the rest of the day. Defendant then accused the judge of having "control issues."

After the first witness finished testifying, defense counsel said she had "nothing further," and defendant interrupted to say, "I do.  Your Honor, I do." The court took a recess, and once the jury was excused, defendant was again removed from the courtroom.  The judge then told counsel that defendant "already had his warnings" for the day and had been told not to "blurt out and talk in front of the jury."  Counsel explained that defendant wanted her to ask questions about lie detector tests for Smith and Patterson that she knew were not permissible, as well as other questions she felt would actually harm defendant's case.  Counsel said that defendant did not understand that certain information is inadmissible and "the distinction of what [his attorneys] can and cannot ask," despite both her and co-counsel explaining it to him "very often."

The court stated that while he appreciated "the difficult position" the attorneys were in, it had made it clear that defendant's disruptive behavior was intolerable.  The court felt that defendant saw the trial as "a game," and that defendant "want[ed] to see how far that he [could] push and how far he [could] go."  The court stated it would bring the jury back in and instruct them again not to consider defendant's statements.  After the lunch break, the court said it would speak to defendant to "see what his temperature [was]," and make a

determination whether defendant could be in the courtroom for the remainder of the day.

The judge instructed the jury as discussed and brought defendant back into the courtroom. Defendant continued to argue with the court about his attorneys not asking questions and claimed that the court was "exaggerating" about his loud speech and behavior. The court issued another warning about his actions and allowed him to stay in the courtroom for the rest of the day.

Over the next several days, defendant interrupted colloquies between the court, the prosecutors, and his attorneys. The court told him to stop and continued on with the day.

During the State's summation, defendant interrupted and asked the prosecutor why she was not telling the jury certain information. The court immediately attempted to quiet defendant while taking a "very short recess." After the jury exited the courtroom, the court removed defendant from the proceedings. As defendant left, he said "[y]ou want me out of here so everybody can lie. Hey, Kate, could you pass . . . a lie detector test?" referring to the prosecutor who had been giving the summation.

A few minutes later, the jurors were brought back into the courtroom, and the court instructed them as follows:

A-2047-22

Ladies and gentlemen of the jury, as I have on a couple of occasions after our work together, I do want to respectfully draw [to] your attention that the defendant is absent from the courtroom. He has an absolute right to absent himself from these proceedings. At this time, he has . . . exercised that right by his behavior. You are not permitted to speculate as to the reason for his absence. The defendant is presumed to be innocent. The burden of proving each and every element of the charges beyond a reasonable doubt rests upon the State and that burden never shifts.

You have heard some statements or remarks from him. He did not make those statements as a witness. His statements are not evidence. You must totally disregard any statements which you may have heard or anything that you may have seen. The only evidence that you are permitted to consider is sworn testimony of witnesses, together with any exhibits which may be admitted into evidence. The defendant is entitled to have the jury consider all of the evidence admitted at trial and nothing else.

The prosecutor then completed her closing statement.

Thereafter, the court and attorneys had another discussion concerning defendant's behavior. The court remarked that there "[didn't] seem to be anything that can be said to dissuade" defendant from disrupting proceedings, and that it "appear[ed] as if [defendant] believe[d] he[] [was] smarter than everyone." The court said it was "not going to put up with drama" during the jury charge the following day, and that it "[didn't] know [if] [it could] have any confidence that it [wouldn't] happen." The court stated it would "take

55

[defendant's] pulse" the next day concerning his attitude and would "make a final determination at that point."  If defendant could not behave in the courtroom during the jury instructions, he would be removed and then brought in afterward to "bring him up to date."  In either event, defendant would be given a copy of the jury charge.

At the start of the next day, the court informed the attorneys that defendant would be left "downstairs" during the jury charge.  The court explained that at this late and "critical stage of the trial," it did not want to risk defendant "interject[ing]" anything or having an "outburst" during the instructions, that could further affect the jury's perception and deliberations.  The court advised it did not want to be "distracted" while reading the charge, and have to "look[] up to see what [defendant] may or may not be doing, who he may or may not be glaring at, and whether or not he's getting all wound up and [ready] to spring out of the chair."  The court stated that after the instructions were completed, it would address defendant and "ask him where he want[ed] to be for the remainder of [the] proceeding."  If defendant could comport himself properly, he could stay in the courtroom; if he could not, he could "stay downstairs and wait for counsel to show [him] information" during the jury's deliberations.

During its final instructions, the court again told the jury that defendant had an "absolute right to absent himself from the trial," that he had "exercised that right," that the jury was "not permitted to speculate as to the reason for" his absence, and that the State bore the burden to prove each element of each offense beyond a reasonable doubt.

After the jury left the courtroom, the court spoke with defendant. During this conversation, defendant continually interrupted the court, stating it was "sad" that he "[had] to consistently point out all the f[***]ing lies," and complaining about certain pieces of evidence and testimony. He told the court that it "should have told people that were lying on the stand" to "shut up" and "get out of here," instead of removing him when he "[said] that truth." He also called the judge a "dictator" and accused him of intending to impose "five life sentences" and using "sneaky, lying, manipulating ways" to accomplish this.

Over defendant's continuing ranting about lying witnesses, the court stated that it appeared defendant's demeanor and lack of respect had not changed. At one point, defendant said he "apologized," so he "should get another chance" to be in the courtroom, but the court noted that defendant had apologized "multiple times" over the course of the trial and then repeated the same bad behavior.

Defendant stated the court was "exaggerating some of the things that [he had] done and throwing [him] out for little to no reason" and for "speaking the truth."

At that point, the court removed defendant, saying it would talk to him again "later in the afternoon." The court addressed the attorneys, saying it did not want to jeopardize "all of the hard work . . . [the] time, and the energy" that had gone into the trial if defendant acted out in front of the jury again. Defendant's attorneys were given an opportunity to speak with him. The court said it would bring defendant into the courtroom if the jury had questions during its deliberations, so he could participate in the discussion of the questions and answers. However, the court intended to remove defendant when it spoke with the jury about its questions, to remove the risk of him "blurt[ing] out" that witnesses lied or other disruptive statements.

Defendant was in the courtroom to hear the jury's requests and the discussion between attorneys and the court. They also began to discuss the bifurcated weapons charges, and whether defendant would stipulate to the existence of the requisite predicate prior offenses.

Defendant was removed from the courtroom while the court answered the jury's questions. When asked if the defense had anything it wanted to place on the record after the jury exited again, counsel said there was a "continued

request" for defendant to be present. The court said that defendant's attitude and behavior had not improved, but that it would "bring him up, from time to time and talk with him to see whether or not he can, in fact, conduct himself professionally." The court reiterated its concern that defendant would "interject himself" into the proceedings in front of the jury and "prejudice the hard work" the jury was doing to deliberate. As a result, the court wanted to "continue to monitor" defendant, and until it determined that defendant could behave appropriately, defendant would "be part of this trial, but not in the presence of the jury."

After the jury was excused for the day, the court brought defendant into the courtroom to "bring [him] up to speed" about the fact that the jury would continue its deliberations after the weekend. Defendant's counsel asked the court to allow defendant to participate fully when the proceedings resumed. The court said it would talk to defendant and "see whether or not his attitude is any better or worse than it was today" before making a decision. Defendant interrupted to say that it would "save everybody time and money and effort" if he was not brought to the courthouse at all; he said once a verdict was reached, the court could "just send it over." The court reiterated its plan for defendant to be present, and to decide based on his behavior whether he could be in the

courtroom during the jury's deliberations and for any further questions it might have.

When the jury continued its deliberations, the court spoke with the attorneys, saying that it learned that defendant, who was "downstairs" at the time, had already been behaving badly that morning. The court reiterated it did not want to risk the possibility that an outburst by defendant would "influence or prejudice [the] deliberating [j]ury."

Defense counsel stated that defendant wanted to either be present for every part of the proceedings or be taken back to jail. The court asked counsel if, based on her experience as an attorney, she could say "with any confidence" that defendant would not go on a "tirade" in front of the jury. Counsel replied, "[n]o, Your Honor . . . I cannot control [defendant] and what he may or may not do, other than just place on the record that he is requesting to participate . . . ." The court replied it had given defendant "every opportunity to comport himself with the decorum [and] . . . respect that is necessary for the orderly proceeding of a criminal trial," but that defendant had "not been able [to] do that." He said that typically, defendant became more "volatile" as the daily proceedings went on, so it was concerning that on this day, defendant "just started at volatile" from the beginning. The court said it had come up with an "accommodation," in

which defendant would be placed in another courtroom with an audio feed that would allow him to hear the proceedings "contemporaneously." Defendant would "not be able to speak," but could "listen as the [c]ourt is addressing the [j]ury," and to "any read-back from the court record." The court said counsel would be "free to go and speak with him" about any issues that came up and then "make his thoughts known" to the court, in the same way as when he had previously been removed from the courtroom.

This plan was carried out, and the proceedings continued with the jury asking further questions. The record reflects defense counsel advised at one point that defendant "[did] not care" about the court's answer to a question about the verdict sheet's instructions. The jury returned its verdict later that day.

After this, the "second bifurcated portion" of the trial began, with the court swearing in defendant. At sidebar, the court asked defendant whether he intended to testify during this part of the trial. Defendant began to argue with the court, claiming he had wanted to testify in the main portion of the trial as well. Calling the judge a "dictator," he said the prosecution had not proven any element of the charges against him and that the judge "railroad[ed] him." The court continued to ask whether defendant wanted to testify, and defendant finally said he did.

A-2047-22

The court then tried to explain to defendant that he would be "asked direct questions" and must "only answer the question that's asked." It also told defendant he would be subject to cross-examination and would not "be able to pick and choose which questions [he] want[ed] to answer." Defendant continued to be argumentative, saying that other witnesses "got to pick and choose their answers" and that the prosecutors had "fed [witnesses] the answers." The court warned defendant that he was "not going to turn this into a circus," at which point defendant accused the court of creating a circus by allowing other witnesses to lie, of "scold[ing] [him] like [he was] a child," and of intending to give him "five life sentences." The court told defendant that if he was unable to confine himself to answering the questions asked, and behaved disruptively, he would be removed from the courtroom again and not permitted to continue testifying.

In front of the jury, the bifurcated trial began with the State presenting defendant's prior judgments of conviction that formed the predicate offenses for the certain persons not to possess firearms charge. Then, defendant was sworn in to testify, and his counsel began to ask, "[n]ow, you just heard some of the judgments of convictions that were placed on the record today. Do you dispute that, the judgment of conviction that was—". Defendant broke in, saying, "[t]he

only thing I dispute is the phone calls that were altered and the photographs that were altered [and] the boots that were altered." As the court admonished him to "listen to the question and answer the question," defendant said, "[e]verybody that got on that stand and lied I dispute." The court excused the jury, but as they left, defendant continued to speak about "altered phone calls," Patterson's and Smith's testimony, and "the representation [he] got from [his] attorneys," saying he "dispute[d]" those issues. Defendant was removed from the courtroom, the jury was brought back in, and the proceedings continued and concluded with the jury finding defendant guilty of the weapons charges.

Following the trial, defendant moved for a new trial, raising several arguments, including that the court's removal of defendant from the courtroom was improper. When the State attempted to respond, defendant interrupted the prosecutor and accused him of lying, and that the court repeatedly asked him to "close [his] mouth." The prosecutor continued, stating that defendant "yell[ed] countless ludicrous things" in front of the jury during trial, "incessantly call[ed] the prosecutors liars," and sometimes spoke so loudly that the jurors could likely hear him from the jury room even when they were not in the courtroom. The prosecutor stated that some of defendant's behavior was "not something that could be picked up in a transcript later on for appeal," including instances where

63

defendant whispered threats to the prosecutors as they walked by him, "tried to testify from his chair," and turned toward the back of the courtroom to "g[i]ve a middle finger" and "address[] the victim's family."

The court denied defendant's motion for a new trial. In pertinent part, the court found that "before, during, and after the trial," defendant had been "disruptive." The court found that defendant spoke loudly during testimony "causing a distraction to the presentation of evidence," and did not comply with instructions to write down his questions to counsel. He also found that defendant did not heed "numerous warnings" that he was expected to comply with courtroom etiquette. However, the court stated that defendant's behavior and subsequent removal from the courtroom were not relevant to the new trial motion based on weight of the evidence, and instead were "ancillary issues" he merely "wanted to address them to make sure that there was an amplification on the record for some of the decisions that were made during the course of [the] trial."

"One of the most basic of the rights guaranteed by the Confrontation Clause" of the Sixth Amendment to the United States Constitution "is the accused's right to be present in the courtroom at every stage of his trial." Illinois v. Allen, 397 U.S. 337, 338 (1970). This right is "protected by the due process

clause of the Fourteenth Amendment 'to the extent that a defendant's absence would hinder a fair and just hearing.'" State v. Luna, 193 N.J. 202, 209 (2007) (quoting State v. Finklea, 147 N.J. 211, 216 (1996)). Rule 3:16(b) explicitly provides that a criminal defendant generally "shall be present at every stage of the trial . . . ." However, it further states that nothing in the Rule "shall prevent a defendant from waiving the right to be present at trial." Ibid.

While "[o]ur system of justice functions best when the accused is present throughout trial," the right to be present "is not absolute." Luna, 193 N.J. at 210. Our justice system also "entrust[s] trial judges with the responsibility to control courtroom proceedings at trial and sentencing," with a judge's discretion to do so "bounded by the law and court rules." State v. Tedesco, 214 N.J. 177, 188-89 (2013).

In Allen, 397 U.S. at 343, the Supreme Court found that although courts "must indulge every reasonable presumption against the loss of constitutional rights," a defendant could "lose" the right to be present during trial if, after warnings from the judge that further disruptive behavior will result in removal, the defendant "insists on" continuing a pattern of actions "so disorderly, disruptive, and disrespectful of the court" that "trial cannot be carried on" in the defendant's presence. It stated that an accused cannot be "permitted by . . .

disruptive conduct indefinitely to avoid being tried," and that court proceedings "cannot and must not be infected with . . . scurrilous, abusive language and conduct . . . ." Id. at 346-47. The Allen Court clarified that once lost, the right to be present could be "reclaimed" if the defendant shows a willingness to behave "consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." Id. at 343.

In Allen, the defendant interrupted jury voir dire, tore up court documents, proclaimed that his appointed attorney "was not going to act as his lawyer," threatened the judge, and repeatedly said that there was "not going to be no trial" because he would "keep on talking all through the trial." Id. at 339-41. The trial court ordered him removed from the courtroom after several warnings, but promised him that he could return "whenever he agreed to conduct himself properly." Id. at 341. Eventually, after the State had presented its case, the defendant "gave some assurances of proper conduct and was permitted to be present through the remainder of the trial . . . ." Ibid.

Similarly, in State v. Spivey, 122 N.J. Super. 249, 255-56 (App. Div. 1973), the defendant engaged in "bizarre behavior" such as "braying, kicking, spitting, singing, [and] moaning," and "mouth[ing] obscenities and insults to the trial judge and others"—behavior which had caused a mistrial once before. We

found no error in the trial judge banning defendant from the courtroom, finding that the judge had advised defendant that he could return when he could behave properly but that defendant "continued his disruptive tactics" whenever he was brought back in. Ibid. We concluded "it is essential to the proper administration of criminal justice that dignity, order and decorum be the hallmarks of all court proceedings" and that "the flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated." Ibid.; see also State v. Reddy, 137 N.J. Super. 32, 36 (App. Div. 1975) (the defendant was properly removed from the courtroom following "a lengthy diatribe and unruly behavior," after "several warnings" and a promise that he could return if he "was willing to comport himself with courtroom decorum").

Here, as detailed, throughout the trial, defendant interrupted the proceedings before the jury by speaking loudly to his attorneys, insisting that they ask questions that were inappropriate or not legally sound, and even blurting out corrections to and complaints about witnesses' testimony. Defendant also demonstrated an inability to follow the court's repeated instructions not to talk when the judge or attorneys were speaking during legal arguments at sidebar and before and after trial each day. His disruptive tactics often caused delays while the court tried to address his behavior. The court

67

continually had to dismiss and recall the jury to try to keep it from hearing things that could prejudice their evaluation of the evidence.

The court addressed defendant directly and advised him multiple times that if he comported himself with the proper decorum, he would be permitted to remain in the courtroom, but if he disrupted the proceedings he would be removed. Defendant was thus fully apprised of the consequences of his actions and what he needed to do to return to the courtroom once removed. Nevertheless, he persisted in his continuous interruptions, loud talking, and intimidation tactics such as glaring at the back of the courtroom. This nonstop display of obstreperous behavior resulted in a determination that defendant waived his right to be present during the portions of trial he missed.

All of the removals took place after defendant persistently refused to behave properly even after being warned again and again. The court gave defendant multiple chances to return, and allowed defendant to be present when he comported himself with respect and even in some instances when he did not. The court displayed great patience in the face of extremely trying circumstances and did not abuse its discretion in controlling the courtroom proceedings. The court's determination to remove defendant from the courtroom when necessary

to ensure a fair trial did not violate his Sixth Amendment rights.  <u>Allen</u>, 397 U.S. at 342-43.

We need only briefly consider defendant's argument that the court erred by not placing him in a room that would allow him to view and hear the proceedings, during the times when he was removed from the courtroom.  In <u>Tedesco</u>, 214 N.J. at 198, the Court stated that, in the context of a sentencing hearing, "if there is no possible way to restore order and contain a defendant's insistent, defiant behavior, a judge can direct that the defendant be taken to a holding cell outfitted with a video or audio feed that will relay the proceedings to the defendant remotely."  However, the Court did not say that such action was required whenever a defendant is removed from a courtroom during any part of a trial as a result of their own inappropriate behavior.

Whether a defendant has a right to participate in their trial by audio/video feed due to their own misbehavior is left to the court's discretion.  Here, defendant was fully apprised of what witness testimony he missed, and was afforded opportunities to speak with his counsel during the portions of trial and jury deliberations when he was removed.  The court did not commit plain error by failing to place defendant in a room with an audio/video feed sooner than it did.

A-2047-22

Lastly, we discern no error in the court's instructions concerning defendant's absence. "It is axiomatic that appropriate jury instructions are essential for a fair trial." State v. Ball, 268 N.J. Super. 72, 112 (App. Div. 1993). Where a defendant does not object to a jury instruction, that instruction is reviewed on appeal for plain error. State v. Cole, 229 N.J. 430, 455 (2017); R. 1:7-2. Defendant thus must demonstrate legal impropriety in the charge that is "sufficiently grievous" to convince this court that "the error possessed a clear capacity to bring about an unjust result." State v. Hock, 54 N.J. 526, 538 (1969).

The Model Jury Charge concerning a defendant's absence reads as follows:

> As you know, (defendant) was absent from the trial. You should not speculate about the reason for his/her absence.
>
> You are not to consider for any purpose or in any manner in arriving at your verdict the fact that (defendant) was not present at trial. That fact should not enter into your deliberations or discussions in any manner, at any time.
>
> (Defendant) is entitled to have the jury consider all evidence presented at trial. He/She is presumed innocent even if he/she is not present.
>
> [Model Jury Charges (Criminal), "Defendant's Absence From Trial" (rev. June 14, 2004).]

The court's instruction, given each time defendant was removed from the courtroom, sufficiently mirrored the Model Jury Instruction concerning this issue. While the court did not tell the jury it could not consider defendant's absence during its deliberations "for any purpose," he did instruct jurors that they were to consider only the evidence presented at trial and that they should not speculate as to the reason for defendant's absence. We are satisfied the language sufficed to ensure that the jury did not take defendant's absences into consideration.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division